**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOAN A. WOLFENSBERGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-cv-7671 |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joan Wolfensberger sustained injuries in a car accident and became unable to work in 2002. Plaintiff applied for and received long-term disability ("LTD") benefits pursuant to an employer-based LTD policy that she held with Defendant Aetna Life Insurance Company. Plaintiff subsequently settled a worker's compensation claim related to the accident for $270,000. When Defendant learned of the worker's compensation settlement, it notified Plaintiff that it would offset her LTD benefits payments by 50% of the settlement amount, in accordance with the "other income benefits" provision of the policy. Plaintiff initiated an appeal of Defendant's offset but did not receive a decision from Defendant. Approximately four months after she submitted her appeal to Defendant, Plaintiff filed the instant ERISA action seeking a declaratory judgment that Defendant had no right to offset her benefits, as well as recovery of the benefits that were allegedly unlawfully withheld.

Currently before the Court are the parties' cross-motions for summary judgment. [15], [28]. For the reasons stated below, the Court denies Plaintiff's motion [15] and grants Defendant's motion [28].

1

# I.    Background

The facts in this case are largely undisputed.  Plaintiff was employed by Accenture as a senior project manager.  Accenture offered its employees LTD insurance through Defendant. Plaintiff participated in the LTD plan. On March 8, 2002, Plaintiff was seriously injured in a car accident and became unable to work. Plaintiff applied for LTD benefits from Defendant under the plan.  Defendant approved Plaintiff's claim and began paying benefits in June 2002. Plaintiff also applied for and was approved for Social Security disability benefits effective January 2004.

Plaintiff filed at least two lawsuits in connection with the car accident.  In October 2009, Plaintiff settled one of the suits, which asserted tort claims, and received a payment of $825,000 from Illinois National Insurance Company. Pursuant to the settlement, Plaintiff signed a release agreement that provided, in pertinent part, "that the sums paid pursuant to this Release specifically includes [sic] payment of any and all liens or claims, by whomsoever made, from any other source. [Plaintiff] further agrees in consideration of the payment herein to make payment of any and all liens or claims growing out of the incident in question and to hold harmless [Illinois National] from any such liens or claims and to defend and indemnify [Illinois National], Releasees, insureds, their insurers and attorneys for any claims or actions related to or arising out of same." [27-4] at CF001461.

Two months later, on December 17, 2009, the Illinois Workers' Compensation Commission approved a settlement agreement in a workers' compensation suit Plaintiff brought against Accenture. See [27-4] at CF001431. (The settlement was actually signed by the settling parties on November 30, 2009. See *id.*) The settlement was entered on a standardized form that had spaces for the settling parties to note any deductions for attorneys' fees, medical reports and x-rays, or "other" items. See [27-4] at CF001430-31. Near the line for attorneys' fees, there is a

handwritten notation, "-0- <u>waived</u>," along with the signature of Plaintiff's then-attorney and a note identifying him as such. *Id.* at CF001431. The form reported that the "Total Amount of Settlement" was $270,000.00; the "Amount employee will receive" was $270,000. *Id.* The settlement agreement was accompanied by a rider that provided, in pertinent part, "This settlement is intended to include and compromise liability for temporary total disability compensation, as well as all medical, surgical, hospital and rehabilitation expenses incurred or to be incurred, for all of which the petitioner [Plaintiff] assumes responsibility. * * * The petitioner has recovered in excess of $800,000.00 in a settlement of related actions filed before the Circuit Court of Cook County. The respondent waives its right to a recovery or reimbursement, if any, under Section 5(b) of the [Illinois Workers' Compensation] Act associated with the related third-party litigation." [27-4] at CF001432.

By letter dated March 9, 2011, Defendant notified Plaintiff that Defendant had been "informed that [Plaintiff] received a Workers' Compensation Settlement for the injury which resulted in your claim for disability benefits * * * in the amount of $270,000.00." [27-4] at CF001439. Citing the "other income benefits" provision of Plaintiff's LTD plan, Defendant stated that "[u]nder the terms of your plan 50% of the award is considered other income, and will reduce your LTD benefit over 60 months in the amount of $2,250.00 per month from December 2009 through December 2014." *Id.* Defendant also set forth in the letter calculations pertaining to the offset and an alleged related overpayment of $33,191.88 in LTD benefits. See *id.* at CF001440. Defendant sent Plaintiff and her attorney a substantially identical letter in early April 2011. See *id.* at CF001444-46.

By letter dated June 30, 2011, Plaintiff through a new attorney appealed Defendant's offset. [27-4] at CF001447-49. Plaintiff acknowledged that "workers' compensation benefits are

encompassed by the policy's 'other income benefits' provisions," but contended that "no offset is due in this instance." *Id.* at CF001447. In support of this contention, Plaintiff pointed to the workers' compensation settlement rider and its reference to Section 5(b) of the Illinois Workers' Compensation Act. See *id.* at CF001447-48. Plaintiff quoted Section 5(b) and asserted that the lien allegedly established by it was extinguished by the tort settlement release, which provided "that the sums paid pursuant to this Release specifically includes [sic] payment of any and all liens or clams, by whomsoever made, from any other source." *Id.* at CF001448. Plaintiff contended that "the amount paid as part of the Workers' Compensation proceeding is added to the sum paid by Illinois National Insurance Company; and that payment is not enumerated within the 'other income benefits' listed in the policy." *Id.* Plaintiff included with the letter copies of both settlement agreements, as well as a copy of Section DI 52001.090 from the Social Security Administration's Program Operations Manual System. See *id.*; *id.* at CF001450-63. Plaintiff contended that Section DI 52001.090 "explains that if the worker repays the workers' compensation, as was done here, it 'results in the worker's being in the same position he would have been in had he never received any WC, but had simply sued for personal injuries,' and asserted that Plaintiff's WC payment is effectively added to the other payment as if workers' compensation benefits had never been paid." *Id.* at CF001448. Plaintiff did not forward to Defendant any medical records or invoices for legal or medical services that she had received.

By letter dated July 22, 2011, Plaintiff through her new attorney informed Defendant that "[w]e would appreciate a response to our initial correspondence we sent to Aetna via certified mail on June 30, 2011." [27-4] at CF001467. The parties dispute the extent and content of their subsequent telephonic communications. They agree that Plaintiff's appeal was never resolved. See [24] ¶ 50; [38] ¶ 50. Plaintiff contends that Defendant "refused to provide her or her

attorneys with a final decision regarding her appeal," [38] ¶ 50, while Defendant contends that "the appeal determination was not provided before Plaintiff filed her complaint as a result of human error and inadvertence." [24] ¶ 50. No appeal determination appears in the record.

## II.    Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir.2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the opposing] position will

be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    Standard of Review

Plaintiff's claim is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, which was "enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829 (2003) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989)). The statute permits a person who is denied benefits under an ERISA employee benefit plan to challenge that denial in federal court. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008); see also 29 U.S.C. § 1132(a)(1)(B).

Generally, "[t]he standard of review of a Plan Administrator's decisions regarding benefits depends on whether the Plan Administrator was given the discretion to make those decisions." *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004). The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the administrator has such discretion, courts review the administrator's decision under an arbitrary and capricious standard, see *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011), which for ERISA purposes is synonymous with abuse of discretion. *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 576 F.3d 444, 449 (7th Cir. 2009).

The policy at issue here provides that Defendant "shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." [24-2] at Policy000019. The parties agree that this language vests Defendant with the discretion contemplated by *Firestone*. See [17] at 6 ("[T]he Policy does confer discretionary authority upon Aetna * * *."); [28-1] at 4 ("[T]here is no dispute that the Plan provided such discretionary authority.").  Indeed, it communicates the same message as language that the Seventh Circuit has identified as providing a "safe harbor": "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000). Despite the parties' agreement on this matter, they dispute which standard of review the Court should apply in light of Defendant's failure to resolve Plaintiff's administrative appeal. Plaintiff contends that "when Defendant failed to timely respond to Plaintiff's appeal submission, it relinquished its discretionary authority, thereby making the standard of review *de novo*." [17] at 6. Defendant maintains that the arbitrary and capricious standard of review should apply, because "[t]here was regular communication with Plaintiff's attorneys and the appeal was in the process of being reviewed." [37] at 10.

The Seventh Circuit has not yet clarified which standard of review applies where a plan administrator with discretion fails to render a decision on administrative appeal.[1] In a case involving an administrator who did resolve an appeal but allegedly made other procedural missteps, the Seventh Circuit explained in a footnote that the "alleged procedural violations do

---

[1] The Court notes that *Estate of Joseph J. Malecki v. Anheuser-Busch Deferred Income, Stock Purchase & Savings Plan*, which presented this very issue to another district court in this Circuit, is currently on appeal before the Seventh Circuit. Case No. 12-2586. Appellate proceedings are currently stayed, however, and briefs have not yet been filed in the matter. The district court in *Malecki* concluded that a *de novo* standard of review was appropriate. See *Estate of Joseph J. Malecki v. Anheuser-Busch Deferred Income, Stock Purchase & Savings Plan*, 2012 WL 2049457, at *10 (N.D. Ill. June 5, 2012).

not mandate a different standard of review but instead will be considered as factors in determining whether [the administrator's] decision to discontinue benefits was arbitrary and capricious." *Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 329 n.3 (7th Cir. 2011). The court also noted, however, that the appellant had raised the issue for the first time in her reply brief and had not cited any law in supporting her contention that *de novo* review should apply. See *id.* The Seventh Circuit also declined to take a position on this issue in *Pakovich v. Broadspire Services, Inc.*, 535 F.3d 601, 606-07 (7th Cir. 2008), in which the question before the court was whether it was proper for a district court to rule on an issue that a plan administrator had not ever addressed, even at the initial stage. In *Pakovich*, the court found "instructive" a case from the Eighth Circuit, *Seman v. FMC Corp. Retirement Plan for Hourly Employees*, 334 F.3d 728, 733 (8th Cir. 2003), and quoted a lengthy excerpt from *Seman*:

> When a plan administrator fails to render any decision whatsoever on a participant's application for benefits, it leaves the courts with nothing to review under any standard of review, so the matter must be sent back to the administrator for a decision. When a plan administrator denies a participant's initial application for benefits and the review panel fails to act on the participant's properly filed appeal, the administrator's decision is subject to judicial review, and the standard of review will be de novo rather than for abuse of discretion if the review panel's inaction raises serious doubts about the administrator's decision.

*Pakovich*, 535 F.3d at 606-07 (7th Cir. 2008) (quoting *Seman*, 334 F.3d at 733). The second sentence of this excerpt directly addresses the issue presently before this Court. Yet the question at issue here was not before the court and, moreover, the court only expressly "adopt[ed] the first part of the Eighth Circuit's rule." *Id.* at 607. The Court therefore cannot conclude from *Pakovich* that the Seventh Circuit definitely would follow the Eighth Circuit's approach. See *Loomis v. Exelon Corp.*, 658 F.3d 667, 674 (7th Cir. 2011) ("Our court has never grappled directly with the subject, and it is not appropriate to read oblique remarks as answering a question not squarely posed.").

Most courts that have addressed the question have concluded that *de novo* review is proper in at least some instances. In *Rasenack ex rel. Tribolet v. AIG Life Insurance Co.*, 585 F.3d 1311, 1316 (10th Cir. 2009), the Tenth Circuit held "that when an administrator violates the statutory deadlines incorporated into the plan, *Firestone* deference no longer applies," but did not address "whether a minor violation of the deadlines or other procedural irregularities would entitle the claimant to *de novo* review." The Eighth Circuit reached a similar conclusion in *Seman*, but, unlike the Tenth Circuit, decided that the *de novo* standard only applies where "the review panel's inaction raises serious doubts about the administrator's decision." *Seman*, 334 F.3d at 733. A court within this district recently applied a *de novo* standard, after concluding that *de novo* review was in accord with Department of Labor commentary, would "provide incentive to plan administrators to ensure that claims are fully and properly considered," and was "only fair given that a claimant's failure to file a timely request for review with a plan can foreclose judicial review." *Estate of Joseph J. Malecki v. Anheuser-Busch Deferred Income, Stock Purchase & Savings Plan*, 2012 WL 2049457, at *10 (N.D. Ill. June 5, 2012). But at least one other district court has determined that "unexplained failure to issue a decision on Plaintiff's appeal is a serious procedural irregularity" but is "not so flagrant or severe as to create a 'substantive harm' to Plaintiff such that de novo review is appropriate." *Hinz v. Hewlett Packard Co. Disability Plan*, 2011 WL 1230046 (N.D. Cal. Mar. 30, 2011).

The Court is troubled by Defendant's failure to exercise reasoned discretion with regard to Plaintiff's appeal. But the Court need not resolve definitively the question of whether the absence of a decision on appeal warrants a return to the default *de novo* standard of review contemplated by *Firestone*. Regardless of whether the Court independently decides the merits under the misleadingly named *de novo* metric, see *Krolnik v. Prudential Ins. Co. of Am.*, 570

F.3d 841, 843 (7th Cir. 2009), or merely assesses whether Defendant acted arbitrarily and capriciously, Defendant is entitled to summary judgment in this matter.

**B.    Merits**

**1.    Right to Offset**

The primary issue in this case is whether Defendant properly offset Plaintiff's LTD benefits in light of her $270,000 workers' compensation settlement. At the heart of this dispute is whether Plaintiff's workers' compensation settlement falls within the "other income benefits" provision of the plan; Plaintiff concedes that "other income benefits" may be subtracted from the standard LTD benefit under the terms of the plan. Plaintiff appears to have made a conscious decision, with the assistance of counsel, to try to structure her seriatim settlement recoveries in such a way as to avoid the definition of "other income benefits."

The plan defines "other income benefits" as follows:

● 100% of any award provided under the Jones Act or the Maritime Doctrine of Maintenance, Wages and Cure.

● Disability or retirement benefits required or provided for under any law of a government. Such law will be considered as it is constituted when the period of total disability starts or as it may be changed after that. Examples are:

Temporary or permanent, partial or total, disability benefits under any workers' compensation law or any other like law, which are meant to compensate the worker for any one or more of the following: Loss of past and future wages, impaired earning capacity, lessened ability to compete in the open labor market, any degree of permanent impairment and any degree of loss of bodily function or capacity.

Statutory disability benefits.

Benefits under the Federal Social Security Act, the Canada Pension Plan and the Quebec Pension Plan.

Any payments provided by the Veterans Administration.

● Disability or retirement benefits under the Federal Social Security Act.

Other income benefits include those, due to your disability or retirement, which are payable to you.

Aetna will determine other income benefits as follows:

***Workers' Compensation Benefit Payments in a Lump Sum:***
That part of the lump sum payment that is for disability will be counted. This will be done if it is or is not the result of a compromise, award or judgment. If there is no proof acceptable to Aetna as to what that part is, 50% will be deemed to be for disability.

This amount will be broken down to a 60 month period. The 60 months will start on the same date as the period for which the lump sum payment is made. If the lump sum payment is not tied to a specific period, the 60 months will start on the date that the lump sum payment is made.

***Other Payments:***
Payments In a Lump Sum (this includes periodic payments that could have been chosen in a lump sum):

> These will be broken down to 60 monthly periods.

Periodic Payments (this includes amounts which are the accumulation of past due periodic payments):

> These will be broken down to monthly periods.

Any Other Payments that date back to a prior date may be allocated on a retroactive basis.

[24-3] at SOC000013-14; [18] ¶ 8.

Notwithstanding this provision, Plaintiff argues that Defendant had "no lawful right to offset [her] LTD benefits with a portion of her workers' compensation settlement." [17] at 7; see also [31-1] at 7. She maintains that she had a "reasonable belief" that she was not required to inform Defendant of the $270,000 settlement with her employer, which she contends was "transmuted" into a tort recovery by the terms of the respective settlement agreements and their ostensible "interplay with the Illinois Workers' Compensation Act." [17] at 8.

Plaintiff contends that she first signed a release in connection with the settlement of her $825,000 tort claim.[2] That release provides that "[t]he sums paid pursuant to this Release specifically include[] payment of any and all liens or claims, by whomsoever made, from any other source." That language, Plaintiff argues, "extinguished" her "workers' compensation claim against Accenture." *Id.* Nonetheless, Plaintiff settled that claim for $270,000 on November 30, 2009, submitted the agreement for review by the Illinois Workers' Compensation Commission, and received the Commission's approval on December 17, 2009.[3] In connection with the workers' compensation settlement, Plaintiff signed a rider that stated, "This settlement is intended to include and compromise liability for temporary total disability compensation, as well as all medical, surgical, hospital and rehabilitation expenses incurred or to be incurred, for all of which the petitioner [Plaintiff] assumes responsibility. * * * [Plaintiff] has recovered in excess of $800,000.00 in a settlement of related actions filed before the Circuit Court of Cook County. [Accenture] waives its right to a recovery or reimbursement, if any, under Section 5(b) of the [Illinois Workers' Compensation] Act associated with the related third-party litigation." [27-4] at CF001432. The import of that agreement, Plaintiff contends, is that the lump sum workers' compensation payment "was added to the sum paid by Illinois National [in the tort settlement], and the lien Accenture had in the settlement between Plaintiff and Illinois National, by virtue of Section 5(b) of the Illinois Workers' Compensation Act, was wiped out. Thus, Plaintiff's workers' compensation claim was extinguished; and her workers' compensation settlement was effectively transmuted into a partial payment of damages through a third-party tort suit." [31-1] at 8; see also [17] at 8.

---

[2] Defendant made no attempt to offset Plaintiff's LTD benefits by any portion of this settlement.

[3] And presumably received and accepted a lump sum payment of $270,000. See, *e.g.*, [17] at 8.

This novel argument, for which Plaintiff has provided no legal authority, does not appear to have any support in Illinois law. Section 5(b) of the Workers' Compensation Act provides:

> Where the injury or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under this Act. In such case, however, if the action against such other person is brought by the injured employee or his personal representative and judgment is obtained and paid, or settlement is made with such other person, either with or without suit, then from the amount received by such employee or personal representative there shall be paid to the employer the amount of compensation paid or to be paid by him to such employee or personal representative including amounts paid or to be paid pursuant to paragraph (a) of Section 8 of this Act. * * * If the injured employee or his personal representative agrees to receive compensation from the employer or accept from the employer any payment on account of such compensation, or to institute proceedings to recover the same, the employer may have or claim a lien upon any award, judgment or fund out of which such employee might be compensated from such third party. * * *

820 ILCS 305/5(b). As the Illinois Supreme Court has explained, the purpose of § 5(b) is to allow "both the employer and the employee an opportunity to reach the true offender while preventing the employee from obtaining a double recovery." *Gallagher v. Lenart*, 874 N.E.2d 43, 61 (Ill. 2007) (quotation omitted). The statute is designed to be "fair to everyone concerned: the employer, who, in a fault sense, is neutral, comes out even; the third person pays exactly the damages he or she would normally pay * * *; and the employee gets a fuller reimbursement for actual damages sustained than is possible under the compensation system alone." *Id.* (quotation omitted) (alteration in original). Thus, had Accenture not explicitly waived its rights to do so, § 5(b) would have afforded it the ability to recover from Plaintiff some portion of the tort settlement. The tort settlement Plaintiff signed acknowledged Accenture's potential lien in the tort settlement and absolved settling party Illinois National from any responsibility should Accenture assert its rights. It did not, as Plaintiff suggests by quoting without context only a

single sentence from the release, provide for the "payment of any and all liens or claims by whomsoever made, from any other source." Instead, as the next sentence of the tort settlement makes clear, it placed the onus of responding to any claims by Accenture (or any other lien holder) on Plaintiff. Plaintiff agreed that she would, "in consideration of the payment herein * * * make payment of any and all liens or claims growing out of the incident in question and * * * hold harmless [Illinois National] from any such liens or claims and * * * defend and indemnify [Illinois National], Releasees, insureds, their insurers and attorneys for any claims or actions related to or arising out of same." [27-4] at CF001461. The settlement did not by this language "incorporate," "transmute," or "extinguish" any subsequent workers' compensation settlement.

Nor does any language in the settlement suggest that the signatories – which did not include Defendant – intended the settlement to accomplish anything other than resolving Plaintiff's workers' compensation claim against Accenture. The settlement is embodied on a standardized form bearing the heading "Illinois Workers' Compensation Commission Settlement Contract Lump Sum Petition and Order." The rider contemplates the existence of a singular, stand-alone "claim" and does not purport to affect the rights of anyone not party to the agreement or resolve any claim not mentioned. Perhaps most telling is Plaintiff's submission of the settlement agreement to the Illinois Workers' Compensation Commission, which is tasked with administering the Workers' Compensation Act. See 820 ILCS 305/13. Had the $270,000 settlement truly been part and parcel of Plaintiff's earlier tort settlement, it seems unlikely that Plaintiff would have thought it necessary to get the approval of the Workers' Compensation Commission, and even more unlikely that the Commission would have had the jurisdiction to approve a tort settlement.

The Social Security Administration's "Program Operations Manual System" is equally unsupportive of the "transmutation" theory. To begin with, it is not clear that the provision cited by Plaintiff, § DI 52001.090, remains in force. (The copy that Plaintiff provided to Defendant, which Defendant submitted to the Court, see [27-4] at CF001462, says "Current through August 2003."). Even if it is in force, however, § DI 52001.090 does not by its terms "provide[] that if an employer's lien for workers' compensation benefits pursuant to Section 5(b) of the Illinois Workers' Compensation Act is extinguished, it is as if workers' compensation had never been paid." [17] at 9. To the contrary, § DI 52001.090(B)(4) provides that where there is a third-party suit and the claimant's employer waives the right to have workers' compensation payments reimbursed, like Accenture did here, any offset of Social Security Disability benefits is "not removed." Plaintiff "does not contest that the POMS so provides, but disputes that [section (B)(4)] is applicable here" because of the alleged "transmutation" of the workers' compensation settlement. [31-1] at 12. As explained above, there was no "transmutation" of any settlement. Moreover, the Social Security Administration's treatment of Plaintiff's federal benefits does not necessarily affect Defendant's treatment of Plaintiff's privately contracted-for benefits. See *Deal v. Prudential Ins. Co. of Am.*, 222 F. Supp. 2d 1067, 1071 n.3 (N.D. Ill. 2002) (explaining that the Seventh Circuit "noted that standards used in adjudicating social security cases may be instructive in ERISA cases * * * [but] said nothing about the instructiveness of applying Social Security Regulations to ERISA cases").

Defendant's ability to offset the workers' compensation settlement was countenanced in the LTD policy and was not affected by either of Plaintiff's settlement agreements or any interaction that those agreements may have had with 820 ILCS 305/5. Plaintiff's arguments do not demonstrate otherwise, when examined under either a *de novo* or arbitrary and capricious

standard, nor do they demonstrate the existence of any material factual issues for trial. Defendant's motion for summary judgment [28] is therefore granted as to its right to offset, and Plaintiff's [15] is denied.

### 2. Amount of Offset

Plaintiff contends that even if Defendant had the right to offset her LTD benefits, "the amount Aetna is offsetting is grossly excessive." [31-1] at 13. Plaintiff takes issue particularly with Defendant's failure to take her attorneys' fees and medical expenses into account, and contends that Defendant is "entitled to an offset of $42,000 at most, which reflects 50% of Plaintiff's workers' compensation settlement after the deduction of her attorneys' fees and medical expenses." [17] at 12. Defendant retorts that Plaintiff has waived this issue by failing to raise it during her ill-fated administrative appeal, and, even if the issue is properly before the Court, Defendant properly followed the policy provisions in calculating the offset. [28-1] at 13. The Court concludes that even if the issue has not been waived, Defendant's computation of the setoff was proper under either standard of review.

The pertinent provision of the LTD policy provides for two possible methods of calculating what portion of a lump-sum workers' compensation payment constitutes "other income benefits." The policy is clear that only the "part of the lump sum payment that is for disability will be counted." [24-3] at SOC000013. If the claimant submits information that enables Defendant to assess what portion of the settlement is "for disability," as opposed to medical expenses, attorneys' fees, or other purposes, the policy dictates that Defendant will make the assessment on the basis of the materials that the claimant submits and count as "other income benefits" only that portion of the recovery that is "for disability." *Id.* If the claimant does not submit "proof acceptable to Aetna" as to what portion of a lump sum payment is "for disability,"

the policy provides that "50% will be deemed to be for disability." *Id.* Thus, the claimant decides in the first instance whether to marshal and submit materials for Defendant's consideration. Defendant then determines whether the "proof" is "acceptable" and, if so, counts as "other income benefits" only that amount of the workers' compensation payment that is "for disability." If Defendant deems the "proof" unacceptable, the default rule applies and Defendant deems 50% of the workers' compensation payment to be offsettable "other income benefits."

Here, Plaintiff chose an all-or-nothing approach to the setoff issue, declining to submit to Defendant, at least in the first instance, any "proof" showing what portion of the $270,000 settlement was "for disability." (The copy of the settlement agreement that she submitted with her initial appeal letter did not make clear how the payment was allocated, notwithstanding the spaces for such information on the standardized form. See [24-3] at CF001431.) Plaintiff relied entirely on her "transmutation" theory, arguing that the $270,000 payment was actually aimed at resolving her tort claim. Defendant did not weigh in on this theory or its effect on the offset calculation before Plaintiff filed this suit reiterating her transmutation theory and adding "proof" of medical expenses totaling roughly $132,000. Plaintiff also contends that Defendant should have reduced the offset to "take into consideration what Plaintiff would have paid in attorneys' fees had she truly adjudicated a workers' compensation claim, and had she not been represented by her husband" – which Plaintiff submits amounts to the statutory maximum of 20% of her total recovery. See [17] at 10; 820 ILCS 305/16a.

Looking at the issue *de novo* – that is, making an independent decision about how the language of the LTD policy applies to the facts of this case, see *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) – the Court is not persuaded that the offset should be calculated any differently. To begin with, even if Plaintiff could convincingly show that her

medical expenses and fees should be subtracted from the settlement payment before the setoff is determined, the amount owed to Defendant would not be cut in half, as Plaintiff suggests. See [17] at 12 ("Aetna is entitled to an offset of $42,000 at most, which reflects 50% of Plaintiff's workers' compensation settlement after the deduction of her attorneys' fees and medical expenses."). The 50% figure in the policy is an alternative method of computation to be used in the absence of adequate information from a claimant, not an additional discount to be applied even where satisfactory proof of the portion of the payment designated "for disability" has been submitted. In addition, Plaintiff's workers' compensation clearly indicates that attorneys' fees were waived and constituted "-0-" of the settlement. [27-4] at CF001431. Having committed herself to that position before the Illinois Workers' Compensation Commission, which per its website "operates the state court system for workers' compensation cases," Plaintiff cannot now claim that any of the settlement, let alone the statutory maximum 20%, was "for" attorneys' fees. *Cf. Wells v. Coker*, --- F.3d ---, 2013 WL 500375, at *3 (7th Cir. Feb. 12, 2013) ("The doctrine of judicial estoppel prevents a party from prevailing on an argument in an earlier matter and then relying on a contradictory argument to prevail in a subsequent matter."). Whether the decision by Plaintiff and her counsel to waive attorneys' fees was aimed at advancing her transmutation theory, was simply a manifestation of counsel's performance of *pro bono* legal services on behalf of his spouse, or was motivated by something else entirely, there is no indication that either Plaintiff or her counsel was duped, misled, or otherwise improperly induced into the agreement. There likewise is no evidence of any windfall to Defendant analogous to that to which the Third Circuit took exception in *US Airways, Inc. v. McCutchen*, 663 F.3d 671, 674 (3d Cir. 2011): Plaintiff did not pay any legal fees in the first instance, and even with the 50% offset is not "in a worse position than if [s]he had not pursued a third-party recovery at all." Based on a

*de novo* assessment, the Court concludes that $0 of the workers' compensation settlement was "for" attorneys' fees.

Finally, the evidence submitted by Plaintiff in support of her claim that more than $132,000 of the settlement was "for" medical expenses consists of a four-page document that is by its own terms a "Partial * * * Summary," essentially a list of medical service providers' names, dates, and dollar amounts. See [18-5] at 3-6. Plaintiff has not provided any information from which the Court can discern, for example, what services were rendered, whether Plaintiff actually paid the amounts listed, whether Plaintiff received any reimbursement due to insurance coverage, or whether the claimed expenses were even related to the accident. Just as some minimal level of detail is required even when a party submits a bill of costs, see *Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble*, 924 F.2d 633, 643 (7th Cir. 1991), so too is an appropriate level of detail necessary where, as here, the amount at issue exceeds $100,000. Based on the lack of detail in Plaintiff's "proof," the Court, like Defendant, is left with no way of engaging in a meaningful *de novo* assessment of Plaintiff's claimed medical expenses. In these circumstances, the Court, like Defendant, concludes that the sensible place to turn is to the default provision in the policy, pursuant to which the Court allocates 50% of the workers' compensation settlement to Plaintiff's disability.[4]

The same result would obtain if the Court applied a deferential standard of review and looked only to the administrative record that was before Defendant. Defendant had before it only the settlement agreements and some statutory and regulatory provisions. It would not be arbitrary or capricious to conclude that these materials did not constitute adequate "proof" as to what

---

[4] As Defendant points out, accepting Plaintiff's $132,000 figure for medical expenses, but declining any credit for the waived attorneys' fees and refusing to apply the 50% discount after subtracting the (claimed) medical expenses actually would leave Plaintiff slightly worse off (by $3,000) than she is under the Court's (and Defendant's) determination of the applicable offset.

portion of the settlement was "for disability." Nor would it be arbitrary and capricious to apply the default provision and decide that "50% will be deemed to be for disability." Accordingly, the Court grants Defendant's motion for summary judgment [28] and denies Plaintiff's motion for summary judgment [15].

**IV.    Conclusion**

For the reasons stated above, the Court denies Plaintiff's motion for summary judgment [15] and grants Defendant's motion for summary judgment [28].

Dated: March 11, 2013                            _____
                                                 Robert M. Dow, Jr.
                                                 United States District Judge